**In re GASTON & SNOW, Debtor,**

**Alfred J. Bianco, As Plan Administrator to the Estate of Gaston & Snow, Plaintiff–Appellee,**

v.

**Robert A. Erkins & Bernadine Erkins, Defendants–Appellants.**

**Docket No. 00–5039.**

United States Court of Appeals, Second Circuit.

Argued Jan. 11, 2001.

Decided March 19, 2001.

---

600

James A. Moss, Herrick, Feinstein LLP, New York, NY, for Defendants–Appellants.

Neal H. Klausner, Davis & Gilbert LLP, New York, NY, (Guy R. Cohen, Amy S. Bennett, on the brief), for Plaintiff–Appellee.

Before: VAN GRAAFEILAND, WINTER & CALABRESI, Circuit Judges.

VAN GRAAFEILAND, Senior Circuit Judge:

Robert and Bernadine Erkins, an Idaho couple, appeal from a final judgment of the United States District Court for the Southern District of New York (Rakoff, *J.*) The judgment entered following a jury trial. The jury found that the Erkins [1] breached an oral contract to pay their attorneys, the now defunct and bankrupt law firm of Gaston & Snow ("G & S"), on an hourly basis. The jury awarded G & S's trustee in bankruptcy, plaintiff-appellee Alfred J. Bianco, $1,800,841.41 for breach of contract damages. Following the jury verdict, the district judge determined that, under the law of Idaho, an award of $2,114,364.94 in prejudgment interest was proper. For the reasons that follow, we affirm.

In deciding this appeal, we are required to resolve an issue that has divided the federal courts. The issue is whether a bankruptcy court hearing claims that are based upon state law and do not implicate federal policy should apply federal choice of law rules or whether the rule of *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), that federal courts exercising diversity jurisdiction must apply the choice of law rules of the forum state, should be extended. Because federal choice of law rules are a type of federal common law, which federal courts have only a narrow power to create, we decide that bankrupt-

---

1. The author is aware of the grammatical rule which dictates that to create the plural form of a proper name that ends in an "s" one must add an "es." *E.g., The Chicago Manual of Style* § 6.5 (13th rev. ed.1982). Thus, the plural of "Erkins" would be "Erkinses." However, the author finds the name "Erkinses" so distracting that he chooses to ignore the rule. No such willingness to ignore the rules of the English language should be imputed to Judges Winter or Calabresi.

cy courts confronting state law claims that do not implicate federal policy concerns should apply the choice of law rules of the forum state.

## BACKGROUND

Defendant-appellant Robert Erkins is a businessman who owned one of the largest trout farming companies in the world. He and his wife, Bernadine also ran an international seafood conference.

In 1984, the Erkins started a new venture raising and marketing oyster mushrooms. They incorporated in the name of Bliss Valley Foods, Inc. They solicited investors—mainly Idaho doctors—and secured a loan from Idaho First National Bank ("First National"). The loan amount was $3,150,000, which the Erkins personally guaranteed and pledged a $5.5 million ranch to secure.

The mushroom operation was unsuccessful; Bliss Valley filed for bankruptcy, and litigation ensued. The Erkins were sued by First National and the investors in Idaho state court. At first the Erkins were represented by an Idaho law firm. However, the Erkins soon came to believe they needed to bring in a firm with "hard hitting" litigators. They found such a firm in G & S. They knew of G & S, a Boston-based firm with a satellite office in New York City, because G & S bankruptcy partner Charles Vihon represented Bliss Valley.

The lead litigator for G & S in the Bliss Valley litigation was Edwin McCabe. McCabe convinced the Erkins that the best defense was a good offense, and therefore that filing a lender liability counterclaim against First National was prudent. The counterclaim alleged First National deliberately sabotaged the mushroom operation and forced Bliss Valley into insolvency. McCabe managed to convince the investors to drop their suit against the Erkins and join in the counterclaim against First National.

The case went to trial and the jury found in favor of the Erkins and Bliss Valley on the lender liability counterclaim. The jury awarded the Erkins $2,001,000 and Bliss Valley $3,100,000. After the verdict was returned, the trial court determined that it should award attorney's fees to the Erkins and Bliss Valley. In doing so, it concluded that G & S had taken the case on an hourly fee basis.

First National appealed. By the time of the appeal, the relationship between the Erkins and G & S had become acrimonious due to disagreements over billing. Thus, the Erkins did not retain G & S to handle the appeal. First National won a reversal in the Idaho Supreme Court. *Idaho First National Bank v. Bliss Valley Foods, Inc.*, 121 Idaho 266, 824 P.2d 841 (1991) (issued on denial of rehearing). Upon remand, the Erkins settled with First National and agreed to pay the bank $400,000.

In 1991, an involuntary chapter 11 petition was filed against G & S in the United States Bankruptcy Court for the Southern District of New York. In 1993, plaintiff-appellee Alfred J. Bianco, Plan Administrator to the Estate of G & S, filed an adversary proceeding against the Erkins seeking to recover $1.7 million for legal services allegedly rendered by G & S to the Erkins.

The Erkins had little, if any, connection to New York. Although G & S had a satellite office in New York, the G & S attorneys who represented the Erkins were based in Boston. Nonetheless, the Erkins did not challenge the New York bankruptcy court's exercise of personal jurisdiction over them. On appeal, the Erkins explain that they did not attempt to dismiss the complaint on personal jurisdiction grounds because they interpreted Bankruptcy Rule 7004 to require minimum contacts with the United States as a whole rather than with the forum state. *C.f.*, *Diamond Mortgage Corp. v. Sugar*, 913 F.2d 1233, 1244 (7th Cir.1990); *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 314 (2d

Cir.1981); *In re Outlet Dep't Stores, Inc.,* 82 B.R. 694, 699 (Bankr.S.D.N.Y.1988).

The Erkins counterclaimed against G & S and moved to transfer the proceedings to the United States District Court for the District of Idaho. After a hearing, Bankruptcy Judge Cornelius Blackshear denied the transfer motion. Thereafter, the proceedings were transferred to the United States District Court for the Southern District of New York for a jury trial.

At trial, the parties presented sharply different versions of the fee arrangement between G & S and the Erkins. The trustee claimed that the Erkins orally agreed to pay G & S's customary hourly rate. Defendants claimed that G & S undertook the representation on a contingency basis. Given that the lawsuit against First National did not yield any recovery for the Erkins, they argued that they owed G & S nothing.

Vihon testified on behalf of defendants that G & S undertook the representation on a contingency fee basis. However, Vihon also testified that G & S and the Erkins never discussed the terms of the contingency agreement. Specifically, Vihon testified that they never agreed upon a percentage of the recovery that would go to G & S. Although Vihon never drafted a written contingency agreement, some of G & S's internal documents indicate that G & S treated its representation of the Erkins as taken on a contingency basis.

Robert Erkins also testified that the case was taken on a contingency basis. However, he was unable to produce any documents demonstrating the terms of the alleged contingency arrangement. Mr. Erkins initially testified that he and Vihon agreed that the percentage was 33%, but later retracted his testimony. Mr. Erkins ultimately testified that he and Vihon never discussed a specific percentage term.

The district court found the lack of a percentage term fatal to defendants' theory that they were under no obligation to pay G & S because the case was taken on a contingency basis. Although courts sometimes may supply a percentage term according to custom, the district court ruled that custom cannot provide a missing term when the representation is far removed from the normal type of case in which contingency agreements are used. The district court ruled that G & S's representation of the Erkins was not a typical contingency fee situation because, as Robert Erkins recognized, a favorable result for the Erkins would not have required a monetary recovery against First National. Rather, if the Erkins merely escaped liability for their guarantee of the loan, that would have been an excellent result. The district judge therefore instructed the jury that the Erkins' defense of a contingency agreement should not be considered.

In support of the view that G & S billed defendants on an hourly basis, Bianco pointed to several documents which evidenced an oral agreement to pay hourly fees. First, Bianco introduced an agreement executed by the Erkins on the eve of the Idaho trial. In the document, the Erkins agreed to pay a premium—an amount above and beyond whatever was owed to G & S prior to the execution of the agreement—in the event the counterclaim against First National yielded a significant monetary recovery. The district court thought this agreement suffered from lack of consideration because McCabe presented the agreement to the Erkins as the price of G & S's continuing representation.[2] In response, Bianco decided not to

---

**2.** This was not the only occasion where a court chastised McCabe and G & S for questionable ethics. The Idaho trial court, after reviewing G & S's fee application, stated that "[t]he Court has been disturbed by Mr. McCabe's firm listing many personal expenses in the Memorandum of Costs and Disburse-

ments. Had these matters not been called to the Court's attention, these items of expense may well have been included in the allowable costs [paid by the bank] and such payment would certainly have amounted to fraud upon the Court.... The Court also notes that [G & S] has used the most expensive means of

seek to have the jury award damages based upon the premium agreement, but continued to rely on the premium agreement as evidence that an oral contract to pay hourly fees had existed prior to the agreement. Specifically, a sentence in the premium agreement noted that "[t]he existing fee arrangements provide G & S . . . shall render professional services to Erkins and shall be paid by the hour and shall be reimbursed for all expenses." Second, the fee application submitted to the Idaho trial court indicated that the Erkins had been billed on an hourly basis. Third, the Idaho trial court found "that this was not a contingent fee case. It was taken on a specific hourly basis and payment of attorneys fees and costs was based upon a favorable outcome of the law suit so far as the counterclaimants were concerned."

Defendants argued that the oral contract claim should be dismissed as barred by the statute of limitations. In analyzing this argument, the district court had to decide which state's statute of limitations applied. Defendants argued that Idaho's four-year limitations period applied, under which, they argued, the oral contract claim was barred. The trustee argued that New York's six-year period applied, in which case the parties agreed the claim was validly pending.

The district judge ruled that New York's limitations period applied.[3] First, the district judge stated that he would sit as if he were a New York state court judge. The district judge did not analyze the main issue we address today—whether a bankruptcy court (or as here, a district court which has been transferred a bankruptcy proceeding for trial) applies federal choice of law rules or the choice of law rules of the forum state. Second, the district judge thought that a New York state court would apply the longer New York limitations period. New York has a "borrowing statute," CPLR 202, which mandates the application of New York's statute of limitations when "the cause of action accrued in favor of a resident of the state." The district court did not identify who was the New York resident for purposes of 202—Bianco or G & S. Defendants did not bring this problem to the district court's attention, but they raise it on appeal. Defendants did argue that it was unconstitutional to apply New York's statute of limitations to them because they had no connection to New York. The district court rejected this argument.

The jury found in favor of the trustee on the breach of oral contract claim, and also on defendants' counterclaim. The jury awarded the trustee $1,800,841.41.

The parties agreed that Idaho law governed the award of pre-judgment interest. The Idaho Code provides for the award of prejudgment interest on "[m]oney after the same becomes due." Idaho Code § 28–22–104(1)2. Idaho courts award prejudgment interest only if the damages are "liquidated or ascertainable by mere mathematical process." *Magic Valley Foods, Inc. v. Sun Valley Potatoes, Inc.*, 134 Idaho 785, 10 P.3d 734, 741 (2000). The district court found the fees owed to G & S were in this category, and awarded plaintiff $2,114,364.94 in pre-judgment interest.

## DISCUSSION

### I. Choice of Law

■ In deciding this appeal, we resolve

---

transportation and the most expensive housing or lodging available . . . . "

**3.** The district court concluded that if the Idaho statute applied, the jury would have been required to determine whether G & S and the Erkins had entered into a separate agreement whereby the Erkins were not required to pay G & S until the conclusion of the Idaho trial. This was true because the vast majority of G & S's legal work for the Erkins occurred more than four years before Bianco filed this action. Thus, for plaintiff's claims to be timely, the jury would have been required to find that the parties entered into a forbearance agreement. Since the jury did not confront this issue, were we to find the Idaho statute applicable, we might thus be required to remand the case for a new trial.

a question left open [4] in *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 350 (2d Cir.1992). There, we suggested, in dicta, that bankruptcy courts [5] should apply the choice of law rules of the forum state unless the case implicates important federal bankruptcy policy.

■ Thus, if *Koreag* suggested the proper rule, the district court was correct in sitting as if it were a New York state court for purposes of determining the applicable statute of limitations. We analyze below whether a New York state court, relying on the borrowing statute, would have applied New York's statute of limitations. By contrast, if federal choice of law rules are to be utilized, the borrowing statute would not be considered and there is little doubt that New York's statute of limitations would not apply. This is true because federal choice of law rules apply the law of the jurisdiction with the most significant relationship with the action, *e.g., Advani Enterprises, Inc. v. Underwriters at Lloyds*, 140 F.3d 157, 162 (2nd Cir.1998); *Pescatore v. Pan American World Airways, Inc.*, 97 F.3d 1, 14 (2d Cir.1996), and New York's relationship to the action is insignificant compared to Idaho's.

The federal courts are divided concerning whether federal choice of law rules or the choice of law rules of the forum state apply. *Compare, e.g., In re Merritt Dredging Co.*, 839 F.2d 203, 205–06 (4th Cir.1988) (utilizing choice of law rules of forum state) *with In re Lindsay*, 59 F.3d 942, 948 (9th Cir.1995) (utilizing federal choice of law rules) *and In re SMEC Inc.*, 160 B.R. 86, 89–91 (M.D.Tenn.1993) (articulating policy reasons why federal choice of law rules should apply).[6] *See generally* James T. Markus & Don J. Quigley, *Conflict of Laws–Which State Rules Govern?*, 18–Nov. Am. Bankr.Inst. J. 18 (1999). Further, our prior cases dealing with other federal statutes that provide a federal forum for claims that hinge upon state law do not provide clear guidance. *Compare Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 795 (2d Cir.1980) (applying federal choice of law rules in case arising under Edge Act) *with Pescatore v. Pan American World Airways, Inc.*, 97 F.3d 1, 12–13 (2d Cir.1996) (applying forum choice of law rules in case arising under Warsaw Convention) *and Brink's Ltd. v. South African Airways*, 93 F.3d 1022, 1029–30 (2d Cir.1996) (same).

■ Our resolution of this question begins with the recognition that federal choice of law rules are a species of federal common law. *See A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1464 (D.C.Cir.1995) ("A choice of law rule is no less a rule of state law than any other...."). The recognition that federal choice of law rules are no different from any other judicially created rule of decision is based upon *Klaxon*, which treated choice of law rules no differently from the arguably more "substantive" type of feder-

---

4. We said in *Kalb, Voorhis & Co. v. American Fin. Corp.*, 8 F.3d 130, 132 (2d Cir.1993), that "[t]he state law to be applied is determined by the choice of law principles of the forum state." We do not view *Kalb's* statement as dispositive of the question before us because there is no indication that utilizing federal choice of law rules would have altered the result in *Kalb* or that the choice of law issue was contested by the parties.

5. Here, the bankruptcy court transferred the case to the district court for a jury trial. The parties have not suggested that this transfer has any effect on our resolution of the choice of law question, and we perceive no reason for concluding otherwise.

6. Other circuits have declined to resolve the question of whether federal or forum choice of law rules apply. *See Matter of Morris*, 30 F.3d 1578, 1581–82 (7th Cir.1994); *Woods–Tucker Leasing Corp. v. Hutcheson–Ingram Dev. Co.*, 642 F.2d 744, 747–49 (5th Cir.1981). *But see Matter of Crist*, 632 F.2d 1226, 1229 (5th Cir.1980) (stating, in a bankruptcy case, that "[w]hen disposition of a federal question requires reference to state law, federal courts are not bound by the forum state's choice of law rules, but are free to apply the law considered relevant to the pending controversy.").

al common law that was prohibited in *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). *See Klaxon,* 313 U.S. at 496, 61 S.Ct. 1020.

■■■ Once it is recognized that federal choice of law rules are a species of federal common law, the framework the Supreme Court has established for determining whether the creation of federal common law is appropriate must be utilized. The ability of the federal courts to create federal common law and displace state created rules is severely limited. The Supreme Court has said that "cases in which judicial creation of a special federal rule would be justified ... are ... few and restricted." *O'Melveny & Myers v. FDIC,* 512 U.S. 79, 87, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994) (internal quotation marks omitted). Before federal courts create federal common law, "a significant conflict between some federal policy or interest and the use of state law must first be specifically shown." *Atherton v. FDIC,* 519 U.S. 213, 218, 117 S.Ct. 666, 136 L.Ed.2d 656 (1997) (internal quotation marks & alteration omitted).

We find no such federal policy or interest that would be violated, in this case, if the choice of law rules of the forum state were utilized. The Ninth Circuit has suggested that there is a federal interest in national uniformity which should not be subordinated to the differences in state choice of law rules. *In re Lindsay,* 59 F.3d at 948; *see also Vanston Bondholders Protective Comm. v. Green,* 329 U.S. 156, 172, 67 S.Ct. 237, 91 L.Ed. 162 (1946) (Frankfurter, *J.,* concurring) (stating that interest in uniformity is in treating existing obligations of the debtor alike, "regardless of the State in which the bankruptcy court sits"). The Ninth Circuit's concern is arguably present here, for the Erkins, who have little connection to New York, find themselves subject to New York's statute of limitations due to the intricacies of New York's borrowing statute. Further, applying a federal rule of most significant contacts may prevent forum shopping by debtors. *In re SMEC,*

160 B.R. at 89–91 ("Rather than allow debtors in the shadow of bankruptcy to restructure or relocate their business dealings in such a way as to gain the benefit of a certain forum's laws, this rule imposes on debtors the laws under which they primarily acted. Likewise, creditors and other parties are not subjected to, or given the benefit of, an unjustified quirk of legal procedure that imposes on them laws under which they rarely or never transacted.").

■■■ We recognize the concerns expressed by these courts, but do not believe they implicate significant enough federal interests to justify the creation of federal common law in this case. While an interest in uniformity can justify the creation of federal common law, *see United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 728, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), *Klaxon* rejected the need for uniformity as a justification for displacing state conflicts rules. *Klaxon,* 313 U.S. at 496, 61 S.Ct. 1020; *see also Zicherman v. Korean Air Lines Co.,* 516 U.S. 217, 228–31, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996). Regarding the federal interest in avoiding forum shopping, we believe there are only a limited number of cases in which this interest is implicated. Here, for example, where the debtor was brought into bankruptcy court through an involuntary petition, it is difficult to argue that any forum shopping occurred.

Counterbalancing the policy concerns expressed by those courts that have utilized federal choice of law rules are the policy goals recognized by the Fourth Circuit in *In re Merritt Dredging,* 839 F.2d at 205–06. The Fourth Circuit explained:

> We believe ... that in the absence of a compelling federal interest which dictates otherwise, the *Klaxon* rule should prevail where a federal bankruptcy court seeks to determine the extent of a debtor's property interest.... A uniform rule under which federal bankruptcy courts apply their forum states' choice of law principles will enhance pre-

dictability in an area where predictability is critical. Most important, such a rule would accord with the model established by *Erie* and *Klaxon*. Both those cases make clear that federal law may not be applied to questions which arise in federal court but whose determination is not a matter of federal law. . . . Such is the case with questions regarding the extent of a bankruptcy debtor's property interests. . . . It would be anomalous to have the same property interest governed by the laws of one state in federal diversity proceedings and by the laws of another state where a federal court is sitting in bankruptcy.

*Id.* at 206 (internal citations omitted). The situation presented in the instant case is slightly different from that facing the Fourth Circuit in *In re Merritt Dredging.* In the instant case there could not have been a diversity action brought against the Erkins in New York because they are not subject to personal jurisdiction in New York. Therefore, in the instant case, the anomaly the Fourth Circuit sought to avoid is not present. However, we find the other reasons advanced by the Fourth Circuit persuasive. The Fourth Circuit's reasoning is also consistent with our cases which have stated that "the *Erie* doctrine applies, whatever the ground for federal jurisdiction, to any issue or claim which has its source in state law." *Maternally Yours, Inc. v. Your Maternity Shop, Inc.,* 234 F.2d 538, 541 n. 1 (2d Cir.1956).

We necessarily limit our holding to cases where no significant federal policy, calling for the imposition of a federal conflicts rule, exists. *C.f., Fore Improvement Corp. v. Selig,* 278 F.2d 143, 147 (2d Cir.1960) (Friendly, *J.,* concurring). This limitation is dictated by *Vanston.* In *Vanston,* the Court confronted a claim against a debtor for "interest on unpaid interest." 329 U.S. at 159, 67 S.Ct. 237. The debtor's other creditors argued that the instrument allowing for interest upon interest was invalid—either under the laws of the states with a connection to the transaction or

under federal law. To determine whether the instrument was valid, the Court was thus faced with a choice of law issue: whether state or federal law determined the validity of the interest upon interest provision. The Court determined that allowing interest upon interest would violate the policy of the Bankruptcy Act and that federal law governed. *Id.* at 163, 67 S.Ct. 237.

*Vanston* contains some broad statements that may be read to suggest that bankruptcy courts should not adopt the choice of law rules of the forum state. *E.g., id.* at 161–62, 67 S.Ct. 237 ("[C]ourts can seldom find a complete solution in the mechanical formulae of the conflicts of law. Determination requires the exercise of an informed judgment in the balancing of all the interests of the states with the most significant contacts in order best to accommodate the equities among the parties to the policies of those states."); *id.* at 162, 67 S.Ct. 237 ("In determining what claims are allowable and how a debtor's assets shall be distributed, a bankruptcy court does not apply the law of the state where it sits."). We do not view these statements as requiring a federal rule in this case. Rather, *Vanston* made clear that application of a federal rule is not foreclosed by *Erie* where there is a significant federal interest. *Vanston* does not mandate that, where there is no such significant federal interest, the federal courts must nonetheless apply federal conflicts rules. To read *Vanston* in this way would create a conflict between *Vanston* and the Supreme Court's pronouncements on the creation of federal common law.

Accordingly, the district court was correct in determining that New York's choice of law rules applied to the trustee's claim against defendants.

## II. New York's Choice of Law Rules

When making a choice of law determination in a contract case, New York courts will normally apply the law of the jurisdiction having the greatest interest in

the litigation, as measured by that jurisdiction's contacts with the litigation. *Matter of Allstate Ins. Co.*, 81 N.Y.2d 219, 225–28, 597 N.Y.S.2d 904, 613 N.E.2d 936 (1993). This would seem to suggest that Idaho law, including Idaho's statute of limitations, would govern.

■ The district court relied on CPLR 202 for the proposition that, notwithstanding New York's normal conflicts rule, a New York state court sitting in this case would have applied New York's statute of limitations. CPLR 202 provides:

> An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, *except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply.*

*Id.* (emphasis added).

We agree with the district court that CPLR 202 is in the nature of an exception to the normal New York conflicts rule of applying the law of the jurisdiction with the most significant contacts. *Cf., Ledwith v. Sears Roebuck & Co.*, 231 A.D.2d 17, 24, 660 N.Y.S.2d 402 (1st Dept.1997) ("Modern choice-of-law decisions are simply inapplicable to the question of statutory construction presented by CPLR 202.... CPLR 202 is to be applied as written, without recourse to a conflict of law analysis."). In certain cases, CPLR 202 may mandate the application of the statute of limitations of a jurisdiction whose contacts with the action are not the most significant. We find that this is such a case.

In this case, New York's statute of limitations should only have been chosen if "the cause of action accrued in favor of a resident" of New York. Defendants argue that the cause of action did not accrue in favor of Bianco, who is admittedly a New York resident, and that G & S was not a New York resident.

Before the district court, defendants did not argue that, even if CPLR 202 applied, there was no New York resident who could benefit from it. Rather, they only argued against the application of CPLR 202 in the first instance. Thus, defendants forfeited their right to argue, on appeal, that there is no New York resident for the purposes of CPLR 202. *Krumme v. Westpoint Stevens Inc.*, 238 F.3d 133, 141–42 (2d Cir. 2000); *United States v. Yu–Leung*, 51 F.3d 1116, 1121–22 (2d Cir.1995). We normally will not consider an argument raised for the first time on appeal, *Diesel v. Town of Lewisboro*, 232 F.3d 92, 107–108 (2d Cir. 2000), and decline to exercise our discretion to consider defendants' argument.[7]

We agree with the district court that defendants' constitutional argument is without merit. Defendants argue that it is unconstitutional to apply New York's statute of limitations to them because they have no connection to New York. This argument would be more persuasive if a New York state court were applying New

---

7. Were the argument not waived, its validity would nevertheless be quite dubious. Even if defendants are correct that the claim did not accrue in favor of a New York resident, CPLR 202 requires application of the shorter of the statute of limitations of New York and the statute of limitations of the state in which the cause of action accrued. A nonresident's contract claim accrues where the nonresident resides. *Global Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 693 N.Y.S.2d 479, 715 N.E.2d 482 (1999). Here, G & S's residence, if not New York, is uncontestedly Massachusetts, which would apply a six year statute of limitations. *See* Mass. Stat. Ann. ch. 260 § 2.

Defendants also argue that because they have not developed sufficient contacts with either New York or Massachusetts for the courts of either state to be capable of asserting *in personam* jurisdiction over them, no cause of action can "accrue" against them in either state for purposes of CPLR 202. This argument was at one point accepted by this Court as reflecting New York law. *See Stafford v. Int'l Harvester Co.*, 668 F.2d 142, 151 (2d Cir.1981). However, it has now been firmly rejected by the Court of Appeals. *See Ins. Co. of North America v. ABB Power Generation*, 91 N.Y.2d 180, 186, 668 N.Y.S.2d 143, 690 N.E.2d 1249 (1997).

York's statute of limitations. Indeed, in that situation, defendants' constitutional argument would be that the New York state courts lack personal jurisdiction over them. Here, by contrast, defendants concede that the bankruptcy court had personal jurisdiction over them. Given this concession, there is no constitutional barrier to utilizing New York's statute of limitations. *Sun Oil Co. v. Wortman,* 486 U.S. 717, 729–30, 108 S.Ct. 2117, 100 L.Ed.2d 743 (1988).

### III. Nature of the Fee Arrangement

Defendants next present two related arguments. First, they argue the district court erred in refusing to submit their position that G & S represented them on a contingency fee basis to the jury. Second, they argue that there was insufficient evidence that they entered into an oral agreement to pay G & S's hourly fees, and that the district court thus erred in allowing the jury to decide whether an oral agreement existed.

 We find no error in the district court's determinations. Regarding the alleged contingency fee arrangement, Robert Erkins retracted his testimony that he and Vihon agreed upon a percentage of the recovery that G & S would receive, and defendants offered no other evidence of this term. While Idaho courts [8] may supply a missing contract term, they will only do so if there is a reasonably certain basis for supplying the term. *Anderson & Nafziger v. G.T. Newcomb, Inc.,* 100 Idaho 175, 595 P.2d 709, 714–15 (1979). Here, defendants suggest that the district court should have supplied a customary contingency percentage such as 33%. We agree with the district court that reference to custom is unavailing because the circumstances of this case are far removed from the typical situation in which a contingency fee arises. One such circumstance distinguishing this case from the typical contingency case is that merely defeating the bank's claim, without recovering on the counterclaim, would have been a favorable outcome for the Erkins but would not have resulted in any monetary recovery.

 Regarding whether the district court properly submitted, to the jury, the question of whether the Erkins entered into an oral contract to pay G & S on an hourly basis, we agree that this was properly a question for the jury. McCabe's testimony that there was an oral contract to pay hourly fees, coupled with the documents which referenced such a contract, was sufficient. Additionally, the jury could have considered whether this case was so far removed from the typical case in which a contingency agreement is present as evidence that the relationship between the parties was actually predicated upon an oral contract to pay hourly fees.

### IV. Prejudgment Interest

 Section 28–22–104 of the Idaho Code provides for the award of prejudgment interest on "[m]oney after the same becomes due." Idaho Code § 28–22–104(1)2. The purpose of awarding prejudgment interest is to compensate the successful claimant for losing the use of the money between the date he or she was entitled to it and the date of judgment. *Stueve v. Northern Lights, Inc.,* 122 Idaho 720, 838 P.2d 323, 325–26 (App.1992). Idaho courts award prejudgment interest where "the amount of liability is liquidated or capable of ascertainment by a mere mathematical calculation." *Doolittle v. Meridian Joint Sch. Dist. No. 2,* 128 Idaho 805, 919 P.2d 334, 343 (1996). Plaintiff argues that the Erkins' liability toward G & S was ascertainable by mere mathematical calculation. We agree.

In resolving this question, we must accept the jury's factual finding that the Erkins and G & S entered into an oral

---

8. The parties agree that, aside from the statute of limitations, Idaho law governs this case.

**610**

contract whereby the Erkins agreed to compensate G & S at G & S's hourly rate. Once this finding is accepted, it is clear that the amount of the Erkins' liability was ascertainable by a mathematical calculation.

We find *Haley v. Clinton*, 128 Idaho 123, 910 P.2d 795, 799 (App.1996) to be distinguishable. In that case, the plaintiff argued the defendant agreed to pay attorney's fees incurred in a separate action. The trial court found an agreement to pay attorney's fees existed, a finding which was upheld by the Court of Appeals. The plaintiff then argued that she was entitled to prejudgment interest. The Court of Appeals disagreed, reasoning that "[o]ne of the main issues at trial was the amount of fees incurred and the amount that had been previously paid. In order to calculate the amount, the district court was required to make credibility determinations, examine conflicting documentary evidence and choose between competing arguments regarding differing sums. Thus, the amount of the award, if any, was not liquidated, nor was it capable of ascertainment by mere mathematical process." *Id.* at 799. In the instant case, by contrast, while the Erkins argued that there was no agreement to pay G & S on an hourly basis, the amount of fees owed if such an agreement existed was not a major issue at trial. We do not read *Haley* to mean that any time the fact of liability is disputed, prejudgment interest is inappropriate. *Cf., Ace Realty, Inc. v. Anderson*, 106 Idaho 742, 682 P.2d 1289, 1298 (App.1984) ("[W]hether prejudgment interest should be awarded does not depend upon whether the amount claimed is disputed or unlitigated. If it did, prejudgment interest would never be awarded—a party could delay payment without incurring interest expense by disputing and litigating any claim." (internal citations omitted)).

## CONCLUSION

We have considered defendants' remaining arguments and find them to be without merit. The judgment of the district court is affirmed.