# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
April 10, 2019

Lyle W. Cayce
Clerk

No. 18-10090

FISHBACK NURSERY, INCORPORATED; SURFACE NURSERY, INCORPORATED,

      Plaintiffs - Appellants

v.

PNC BANK, NATIONAL ASSOCIATION,

      Defendant - Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before SMITH, DUNCAN, and ENGELHARDT, Circuit Judges.

STUART KYLE DUNCAN, Circuit Judge:

We confront a lien contest among three creditors of a bankrupt commercial farm. Two of the creditors—Fishback and Surface—are nurseries that sold the farm over a million dollars' worth of trees and shrubs in Michigan, Tennessee, and Oregon, and so claim agricultural liens in the farm's assets. The third creditor is a bank, PNC, that claims debtor-in-possession liens based on financing it provided to keep the farm afloat during bankruptcy. The central issue is whether the bank's lien outranks the nurseries' liens.

To settle that dispute, the district court had to decide first whether Michigan, Tennessee, or Oregon law governed the nurseries' liens. Ably

No. 18-10090

navigating a knotty choice-of-law issue, the court ruled that the locale of the plants dictated the pertinent lien law. Applying that law, the court found that the nurseries' liens were either unperfected or unenforceable. This meant the bank's lien was senior.

The nurseries appeal. We affirm.

I.

A.

The parties stipulated to the following facts. BFN was a wholesale grower of trees, shrubs, and other plants, with headquarters in Texas and offices in Michigan, Oregon, and Tennessee. BFN filed for bankruptcy in Texas on June 17, 2016. Three of BFN's creditors dispute the priority of their respective liens on BFN's assets. Two of those creditors, Appellants Fishback and Surface, are commercial nurseries (collectively "Nurseries"), both located in Oregon. The third creditor, Appellee PNC, is a national bank headquartered in Pennsylvania.

The Nurseries are BFN's creditors because they sold agricultural products to BFN and took security interests in them. Fishback demands over $1.1 million for products shipped to Michigan, Tennessee, and Oregon. As to those products, Fishback filed Uniform Commercial Code ("UCC") financing statements[1] in Oregon and Michigan on June 21, 2016, and in Tennessee on June 28, 2016. All three statements listed the debtor's name as "BFN Operations, LLC abn Zelenka Farms," despite the fact that BFN's founding documents list its name as "BFN Operations LLC." On August 29, 2016,

---

[1] "Perfection by filing is by far the most common method of perfecting a security interest under [UCC] Article 9." 4 WHITE, SUMMERS, & HILLMAN, UNIFORM COMMERCIAL CODE § 31:27 (6th ed. 2018). A UCC-1 financing statement must provide the name of the debtor and the name of the secured party, and indicate the collateral covered by the financing statement. *Id.* at §§ 31:28; 31:29, 31:30.

No. 18-10090

Fishback also filed a notice of lien in Oregon for all orders. For its part, Surface demands over $262,000 for products shipped to Michigan only. Surface filed a UCC financing statement in Michigan on June 28, 2016, which also listed the debtor's name as "BFN Operations, LLC abn Zelenka Farms." Surface also filed a notice of lien in Oregon on July 13, 2016.

PNC is BFN's creditor because, as early as May 2015, it loaned BFN money and took a security interest in most of BFN's assets. During the bankruptcy proceedings, PNC also provided debtor-in-possession ("DIP")[2] financing so that BFN could stay in business during bankruptcy. The bankruptcy court ordered that the DIP financing would include PNC's pre-bankruptcy loan to BNF and that PNC's DIP lien would outrank other liens "subject and junior only to . . . valid, enforceable, properly perfected, and unavoidable pre-petition liens[.]"

## B.

The Nurseries sued PNC in federal district court in November 2016, seeking a declaratory judgment that their liens on BFN assets were "valid, enforceable, properly-perfected, unavoidable pre-petition liens," senior to PNC's DIP lien, and asking the court to order PNC to turn over money to satisfy their allegedly senior liens. PNC counterclaimed for a declaratory judgment that the Nurseries lacked senior and enforceable liens. In August 2017, the parties filed cross-motions for summary judgment. The district court ruled for PNC and against the Nurseries.

In its opinion, the district court first considered which choice-of-law analysis should determine the law governing the lien dispute. As the court

---

[2] A debtor-in-possession has the power "to continue to operate the debtor's business [during bankruptcy] without first having to go to the court to obtain an order authorizing the operation." 5 NORTON BANKR. L. & PRAC. 3d § 93:4 (2019); *see also* 11 U.S.C. § 1107(a) (providing that a debtor-in-possession has many of the powers of a bankruptcy trustee).

No. 18-10090

noted, it is an open question in this circuit as to whether courts exercising bankruptcy jurisdiction[3] should apply forum or federal choice-of-law rules. *See In re Mirant Corp.*, 675 F.3d 530, 536 (5th Cir. 2012) (stating "[t]his circuit has not determined whether the [federal] independent judgment test or the forum state's choice-of-law rules should be applied in bankruptcy") (citing *Woods-Tucker Leasing Corp. of Ga. v. Hutcheson-Ingram Dev. Co.*, 642 F.2d 744, 748 (5th Cir. 1981)). The circuits are split on this issue. *See In re Sterba*, 852 F.3d 1175, 1177 n.1 (9th Cir. 2017) (recognizing split). Some courts—drawing on the rule that federal diversity courts must apply forum choice-of-law rules—have held that federal courts in bankruptcy should also apply forum choice-of-law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941); *see also In re Gaston & Snow*, 243 F.3d 599, 605–07 (2nd Cir. 2001); *In re Merritt Dredging Co.*, 839 F.2d 203, 206 (4th Cir. 1988). Other courts have held, to the contrary, that "federal, not forum state, choice of law rules" apply in bankruptcy cases because they are "federal question cases with exclusive jurisdiction in federal court." *In re Lindsay*, 59 F.3d 942, 948 (9th Cir. 1995); *see also In re SMEC, Inc.*, 160 B.R. 86, 89–91 (M.D. Tenn. 1993) (explaining why federal choice-of-law rules should apply).

The district court declined to choose one choice-of-law approach over the other because, in its view, both would give the same answer. *See, e.g., Woods-Tucker Leasing Corp.*, 642 F.2d at 748–49 ("see[ing] no need to resolve" choice-of-law approach because either analysis "would lead to the same result") (citing

---

[3] The district court found it had jurisdiction under 28 U.S.C. § 1334(b), which provides district courts "original but not exclusive jurisdiction of all civil proceedings . . . arising in or related to cases under title 11" of the Bankruptcy Code. *See, e.g., In re Galaz*, 765 F.3d 426, 430 (5th Cir. 2014) (discussing scope of "related to" bankruptcy jurisdiction under section 1334(b)) (citing *In re Walker*, 51 F.3d 562, 568–69 (5th Cir. 1995)). The district court declined to resolve whether it also had diversity jurisdiction under 28 U.S.C. § 1332. The resolution of that question did not affect the district court's analysis, nor does it affect ours.

No. 18-10090

*Fahs v. Martin*, 224 F.2d 387, 399 (5th Cir. 1955)); *see also In re Morris*, 30 F.3d 1578, 1582 (7th Cir. 1994) (same). Texas' choice-of-law rule would determine lien priority according to the law of the states where BFN received the products. *See* TEX. BUS. & COM. CODE § 9.302 (providing, "[w]hile farm products are located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of an agricultural lien on the farm products").[4] The federal choice-of-law analysis would look to the UCC and the Second Restatement of Conflicts of Law to determine which state has the "most significant relationship" to the case. *See, e.g.*, *Mirant*, 675 F.3d at 536 (relying on the Second Restatement); *Woods-Tucker*, 642 F.2d at 748–49 (relying on the UCC). Under that approach, the district court found, lien priority would also look to the law of the products' location. *See, e.g.,* U.C.C. § 9-302 (same rule for lien priority as Texas rule); RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 251(2) (absent "effective choice of law by the parties," giving "greater weight . . . to the location of the chattel at the time that the security interest attached"). In sum, either choice-of-law approach, forum or federal, would end up determining lien priority under the law of the respective state where the farm products were located.

The district court next addressed the merits of the lien dispute. As to the Michigan and Tennessee products, the court found the Nurseries lacked perfected liens due to defective financing statements. Their statements incorrectly listed the debtor's name as "BFN Operations, LLC abn Zelenka

---

[4] The parties do not dispute that the products are farm products, nor that the liens are agricultural liens. *See id.* § 9.102(a)(34) ("farm products" include "goods, other than standing timber, with respect to which the debtor is engaged in a farming operation [and are] crops grown, growing, or to be grown, including . . . crops produced on trees, vines, and bushes"); *id.* § 9.102(a)(5) (an "agricultural lien" is "an interest in farm products" that secures payment or performance for "goods or services furnished in connection with a debtor's farming operation"). Additionally, the parties stipulated that the products were delivered to BFN's farms in Michigan, Tennessee, and Oregon.

Farms," instead of the name listed on its founding documents, "BFN Operations LLC." That is insufficient under Michigan and Tennessee law, which require listing the debtor's name exactly as it appears on the public documents creating the entity. *See* MICH. COMP. LAWS § 440.9503(1)(a); TENN. CODE ANN. § 47-9-503(a)(1). Nor would "savings clauses" help the Nurseries, the court found. Those clauses validate an incorrect financing statement only if a database search using the debtor's correct name would produce the statement with the incorrect name. *See* MICH. COMP. LAWS § 440.9506(2); TENN. CODE ANN. § 47-9-506(b), (c). But it was undisputed that, under the strict search logics in these states, searching with BFN's correct name would not uncover the incorrectly named liens. *See* MICH. ADMIN. CODE r. 440.510; TENN. COMP. R. & REGS. 1360-08-05-.04 (setting out UCC search logics). Because the Nurseries lacked perfected liens on the Michigan and Tennessee products, the district court concluded those liens were not senior to PNC's lien.

As to the Oregon products, the district court found Fishback failed to extend its lien under Oregon law. Unlike Michigan and Tennessee, Oregon does not require filing a notice to perfect an agricultural lien. *See* OR. REV. STAT. § 87.705(2). The lien, however, expires 45 days after final payment is due, unless the producer files an extension supported by affidavit and containing specified information. *Id.* § 87.710(1), (2). The undisputed facts showed that Fishback's lien extension was due August 11, 2016, but no extension was filed until August 29, 2016—too late under Oregon law. Fishback countered that it "substantially complied" with the extension requirement by filing a UCC financing statement in Oregon on June 21, 2016. The district court rejected this argument, however, finding the UCC statement met virtually none of Oregon's extension requirements and would mislead third-party creditors if allowed to substitute for the required notice. Because

No. 18-10090

Fishback's lien had expired under Oregon law, the district court concluded that it was unenforceable and so could not be senior to PNC's lien.

The district court therefore denied the Nurseries summary judgment and granted PNC summary judgment. The Nurseries appeal.

## II.

"We review an order granting summary judgment *de novo*, applying the same standards as the district court." *Cooley v. Hous. Auth. of City of Slidell*, 747 F.3d 295, 297 (5th Cir. 2014) (citation omitted); FED. R. CIV. P. 56(a).

## III.

## A.

We first consider the choice-of-law issue. The Nurseries argue on appeal that the district court erred by applying the law of the jurisdictions where the farm products were located (Michigan, Tennessee, and Oregon, respectively). Instead, they contend Oregon law should govern the lien dispute as to all products, essentially for two reasons: (1) contracts between Fishback and BFN contain a choice-of-law provision selecting Oregon law; and (2) alternatively, a proper application of both Texas and federal choice-of-law principles point to Oregon law. We address each argument in turn.

First, the district court correctly rejected application of any contractual choice-of-law clauses. The only such clauses identified by the Nurseries appear in the Fishback–BFN invoices.[5] But here we do not have a contractual dispute between Fishback and BFN, to which the choice-of-law clause might apply. *See, e.g., Energy Coal. S.P.A. v. CITGO Petroleum Corp.*, 836 F.3d 457, 459–60 (5th Cir. 2016). Instead we have a dispute between the Nurseries and a third party

---

[5] The clauses provide that "[a]ll matters regarding these transactions shall be governed by Oregon law including but not limited to [OR. REV. STAT.] § 87.700 et seq." The Surface–BFN invoices contain no choice-of-law provision. So, even if such a provision somehow applied to PNC, how that would help Surface is a mystery.

No. 18-10090

(PNC) over lien priorities in BFN assets. The Nurseries identify no authority for applying a choice-of-law provision in a contract to a lien dispute with a third party. Doing so, as the district court pointed out, would be unfair to parties who are strangers to the contract containing the choice-of-law provision, "including third-party creditors in lien disputes like this one." That is why Texas choice-of-law rules (adopted from the UCC) limit parties' ability to contract around the law governing priority and perfection of "security interests and agricultural liens."[6] *See, e.g., Carlson v. Tandy Computer Leasing*, 803 F.2d 391, 394 (8th Cir. 1986) (applying similar provision under Missouri UCC to "prohibit choice of law agreements when the rights of third parties are at stake," in contrast to "situations where only the rights of parties privy to the initial choice of law agreement are implicated"). The district court thus correctly rejected the Nurseries' argument that any choice-of-law provision in the Fishback–BFN contracts should control the law applicable to the Nurseries' lien dispute with PNC.

Second, the Nurseries fail to show that the district court misapplied either the Texas or federal choice-of-law rules. As to the Texas rules, the Nurseries say the district court should have applied the test in "section 188 of the Restatement (Second) of Conflict of Laws" and determined that Oregon law applied. They are mistaken. As the Nurseries' own authorities explain, that section applies to "evaluating choice-of-law issues in *contractual disputes*."

---

[6] *See* TEX. BUS. & COM. CODE §§ 1.301(b), 9.302 (providing laws on perfection and priority of "security interests and agricultural liens" in, *inter alia*, § 9.302, "govern[ ]" and "a contrary agreement is effective only to the extent permitted by the law (including the conflict of laws rules) so specified"); *id.* § 1.301 cmt. 5 (explaining that § 1.301(b) places "essential limitations on the parties' right to choose the applicable law," especially because "parties taking a security interest . . . must have sure ways to find out whether and where to file and where to look for possible existing filings"). Texas adopted this approach from the UCC. *See* UCC § 1-301(c)(8); *id.* cmt. 4. Michigan and Tennessee have done the same. *See* MICH. COMP. LAWS § 440.1301(3)(g) & cmt. 4; TENN. CODE ANN. § 47-1-301(c)(7) & cmt. 4.

No. 18-10090

*Minn. Mining & Mfg. Co. v. Nishika Ltd.*, 953 S.W.2d 733, 735–36 (Tex. 1997) (emphasis added).[7] This case—as we have taken pains to emphasize—involves not a contractual dispute but rather a dispute over competing lien priorities in a bankrupt company's assets. Analysis of choice-of-law in lien priority disputes begins, not with section 188, but with the "most significant relationship" test in section 6. *See Sommers Drug Stores Co. Emp. Profit Sharing Tr. v. Corrigan*, 883 F.2d 345, 353 (5th Cir. 1989) (observing "Texas has adopted the 'most significant relationship' test of the Restatement (Second) of Conflict of Laws § 6 (1971) for resolving choice of law issues") (citing *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex. 1984)).[8] And the section 6 test is quite simple to apply where, as here, "Texas . . . has a statute which specifically controls the choice of law issue." *Sommers*, 883 F.2d at 353. That statute is section 9.302 of the Texas Business and Commerce Code, which, as the district court recognized, specifies that agricultural lien perfection and priority are governed by the law of the jurisdiction where "farm products are located." TEX. BUS. &

---

[7] Section 188 provides that the rights and duties of parties "with respect to an issue in contract" are determined by state law "which, with respect to that issue, has the most significant relationship to the transactions and the parties" under the general section 6 principles. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(1). It also lists specific contacts to inform section 6, absent a choice of law by the parties. *Id.* § 188(2).

[8] Section 6 provides as follows:

(1)  A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
(2)  When there is no such directive, the factors relevant to the choice of the applicable rule of law include
   (a) the needs of the interstate and international systems,
   (b) the relevant policies of the forum,
   (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
   (d) the protection of justified expectations,
   (e) the basic policies underlying the particular field of law,
   (f) certainty, predictability and uniformity of result, and
   (g) ease in the determination and application of the law to be applied.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(1), (2).

No. 18-10090

COM. CODE § 9.302; *see also, e.g.,* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 cmt. a (noting courts generally "must apply a local statutory provision directed to choice of law," and citing as "[a]n example of [such] a statute . . . the Uniform Commercial Code"). We therefore reject the Nurseries' argument that the district court incorrectly applied Texas choice-of-law rules.

As to the federal choice-of-law rules, the Nurseries argue that—to the extent we follow their confusing argument—the district court "erred by relying on Section 6 of the Restatement" in its choice-of-law analysis. But our precedent instructs that the section 6 factors are a touchstone for the federal test. *See, e.g., Mirant*, 675 F.3d at 536 & n.2 (explaining that the federal "independent judgment test is essentially synonymous with the most significant relationship approach adopted by the [Second Restatement]" and referring to the section 6 factors) (internal quotes and citations omitted). And, as explained above, section 6 is easy to apply where a statute controls the choice-of-law issue.[9] The Nurseries also argue, puzzlingly, that the district court erred by relying on "UCC–Article 9" principles in the federal choice-of-law analysis. But this again ignores our precedent, which has referred to UCC principles as a key factor in the analysis. *See, e.g., Woods-Tucker*, 642 F.2d at 749 (observing that, in federal choice-of-law analysis, the UCC "'should generally be considered as the federal law of commerce including secured transactions'" (quoting *In re King-Porter Co.*, 446 F.2d 722, 732 (5th Cir. 1971)). Finally, the Nurseries make the bizarre argument that the district court erred by applying "on multiple occasions . . . section 251 of the Restatement (Second)

---

[9] Although recognizing that the specific UCC and Texas choice-of-law provisions essentially settled the question, the district court also analyzed the section 6 factors and determined that the states with the "most significant relationship" to the case were those where the products were located. *See, e.g., Sommers*, 883 F.2d at 353 & n.2 (discussing section 6 factors). While not strictly necessary—given the specific statutory provisions pointing to the same result—we find no error in the district court's comprehensive analysis.

10

No. 18-10090

Conflict of Laws which specifically addresses UCC conflict of laws issues." But the district court was exactly right to refer to section 251: Squarely applicable to the conflicts puzzle here, section 251 advises courts to give "greater weight . . . to the location of the chattel at the time that the security interest attached than to any other contact in determining the state of the applicable law." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 251(2). That is just what the district court did, giving precedence to the products' location in determining lien priority rules. We find no error in the district court's application of the federal choice-of-law analysis.

In sum, we reject the Nurseries' arguments that the district court erred in determining the law applicable to the parties' lien dispute.

B.

We turn to the merits. At the outset, we note that the Nurseries do not contest on appeal the district court's conclusion that the Michigan and Tennessee liens were not properly perfected under those states' laws. They have therefore waived any error as to those issues. *See, e.g., Bailey v. Shell Western E&P, Inc.*, 609 F.3d 710, 722 (5th Cir. 2010) ("Issues not briefed on appeal are waived."). The Nurseries argue only that the district court erred in determining that they failed to extend the lien on the Oregon farm products.

The district court ruled that (1) Fishback's[10] Oregon lien expired because Fishback failed to timely file the notice required by Oregon law to extend the lien beyond expiration, and (2) Fishback's previous filing of a UCC financing statement did not "substantially comply" with the notice requirement. Fishback contests both points, arguing that the UCC statement should either

---

[10] Our discussion in this section pertains only to Fishback because, as already noted, only Fishback shipped products to Oregon.

No. 18-10090

count as the lien extension or, at a minimum, should constitute "substantial compliance" with the notice requirement.

Under Oregon law, an agricultural producer has a lien for the price or value of produce that attaches the date the produce is delivered. OR. REV. STAT. § 87.705(1). While the producer "need not file any notice in order to perfect the lien," *id.* § 87.705(2), the lien expires "no later than the end of the 45th day after the date that the final payment to the agricultural producer is originally due, unless the producer extends the lien" by filing a notice of lien or notice of claim of lien. *Id.* § 87.710(1), (2); *see also id.* § 87.705(2) (producer "must file a notice of lien as provided in ORS 87.710 or a notice of claim of lien as provided in ORS 87.242 to extend the lien beyond the normal expiration date"). The notice of lien under section 87.710 may be filed "only during the period after the date that payment for the agricultural produce is originally due and no later than the 45th day after the date that the final payment for the produce is due." *Id.* § 87.710(2). The notice "must be supported by affidavit and contain" the following information:

(a) a true statement of the agricultural producer's demand after deducting all credits and offsets;

(b) the name of the purchaser that received the agricultural produce to be charged with the lien;

(c) a description of the produce delivered or transferred by the producer sufficient to identify the basis for the lien;

(d) a statement that the amount claimed is a true and bona fide existing debt as of the date of the filing of the notice of lien;

(e) the date that the final payment to the producer was originally due; and

(f) such other information as the Secretary of State may require.

No. 18-10090

*Id.* Additionally, within 20 days of the filing, the producer must send the notice to all persons who have perfected security interests under Oregon law in the same products. *Id.* § 87.710(3), (4).[11]

In this case, it was stipulated that final payment from BFN to Fishback was due "within ninety (90) days from the date of invoice." The invoice date was March 29, 2016. Final payment was thus due 90 days later on June 27, 2016. Under Oregon law, Fishback's lien would therefore expire 45 days after that, on August 11, 2016, unless Fishback filed the required notice before that date. *Id.* § 87.710(1). Fishback, however, concedes it did not file its notice of lien until August 29, 2016—too late under the statute.[12]

Fishback invites us to ignore all this and treat a different document—its UCC financing statement filed June 21, 2016[13]—as the notice required by Oregon law. We decline. Fishback points us to no authority for treating the UCC statement as a notice of lien, and to do so would contravene the plain terms of Oregon law. The relevant statute provides that, in order to "extend the [agricultural] lien beyond the normal expiration date," the producer "must file a notice of lien *as provided in [Or. Rev. Stat. §] 87.710* or a notice of claim of lien *as provided in [Or. Rev. Stat. §] 87.242*." *Id.* § 87.705(2) (emphases and brackets added). Fishback does not even claim that its UCC statement was filed pursuant to these specific Oregon statutes. Nor could it: In Oregon, UCC

---

[11] The "notice of claim of lien" has slightly different requirements, *see* OR. REV. STAT. § 87.242(2), but they would not change the result here and are, in any event, immaterial since Fishback's late notice expressly referenced the notice provision of section 87.710.

[12] Fishback's notice of lien filed August 29, 2016 states that payment from BFN was originally due August 31, 2016. But the stipulated facts state that final payment was due within 90 days from the invoice date, and the invoices are all dated March 29, 2016. Ninety days from March 29, 2016 is June 27, 2016. Fishback does not contest any of these dates, nor does it contest the district court's assessment that its August 29 filing was untimely.

[13] The district court opinion states the UCC statement was filed July 13, 2016, but the record reflects it was filed June 21, 2016. The discrepancy makes no difference to the analysis.

financing statements are filed under a different chapter altogether. *See* OR. REV. STAT. § 79.0501 *et seq.* We therefore reject Fishback's argument equating a UCC statement with the required notice of lien.

Undaunted, Fishback argues that the UCC financing statement should be treated as "substantial compliance" with the extension requirement. The district court correctly rejected this argument. Under Oregon law, substantial compliance requires complying with "'the essential matters necessary to assure every reasonable objective of the statute.'" *Rogers v. Roberts*, 717 P.2d 620, 622 (Or. 1986) (quoting *Sabatini v. Jayhawk Constr. Co., Inc.*, 520 P.2d 1230, 1234 (Kan. 1974)). Courts consider the "degree of noncompliance," the "policy which underlies the particular statutory provision," and any "prejudice" to others. *McGregor Co. v. Heritage*, 631 P.2d 1355, 1357 (Or. 1981) (internal quotes and citation omitted). As the district court found, "Fishback's degree of noncompliance was high." It filed a statement prescribed by an entirely different provision of Oregon law, *see* OR. REV. STAT. § 79.0502, that was not supported by the required affidavit, *see id.* § 87.710(2), that was not "in a form prescribed by the Secretary of State," *see id.* § 87.736(1), that was filed too early, *see id.* § 87.710(2), and that did not contain the information required in a notice of lien. *Compare id.* § 79.0502(1) (financing statement's required contents) *with id.* § 87.710(2) (notice of lien's required contents). Moreover, as the district court observed, allowing the UCC statement to "pull double duty" as a notice of lien would cause prejudice by failing to notify others that a lien has been extended: "Searchers of Oregon's lien index cannot determine the duration of a lien just by looking at a financing statement." Instead, that is the notice of lien's purpose, which is why Oregon law specifically requires it to warn others that a lien has been extended beyond the usual 45-day expiration date. *See id.* § 87.710(1) (providing that, "[i]f the agricultural producer extends

the lien, the lien expires no later than the 225th day after the date that the final payment to the producer is originally due").

We thus conclude that Fishback failed to comply, substantially or otherwise, with Oregon's notice requirement via a UCC financing statement.

## IV.

In sum, we find no error in the district court's ruling that the Nurseries' liens were not senior to PNC's lien on the bankrupt company's assets. The district court therefore correctly granted PNC summary judgment.

AFFIRMED.